# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

|  |  |
|---|---|
| **ESTATE OF WILLIAM ELDER HOMAN,** *deceased*,[1] | |
| *Plaintiff,* | **CIVIL ACTION NO.** **5:21-cv-00053-TES** |
| **v.** | |
| **GEOFFRY OSMAN,** *et al.,* | |
| *Defendants.* | |

## ORDER

On February 6, 2019, officers arrested William Homan based on an outstanding warrant for shoplifting and transported him to the Macon-Bibb County Law Enforcement Center ("LEC"). [Doc. 50-1, ¶ 2].[2] Once Homan arrived at the LEC, he was screened by medical personnel. [*Id.* at ¶ 3]. That intake screening concluded that Homan did not pose a suicide risk. [*Id.* at ¶ 4]. On February 9, after being placed in a cell, Homan broke a sprinkler head in his cell, which caused flooding in the J-block

---

[1] The Clerk is **DIRECTED** to amend the docket caption to reflect the Estate of William Elder Homan, deceased, as Plaintiff. *See* [Doc. 28].

[2] Plaintiff, as the respondent, did not comply with the local rules and file a response that disputed either of the Defendants' Statement of Material Facts. As a result of Plaintiff's noncompliance, the Court is compelled to enforce its rules and deem Defendants' Statement of Material facts admitted pursuant to Local Rule 56. *See* M.D. Ga. LR 56; *see also, e.g., Bryant v. Norfolk S. R.R.*, No. 22-10452, 2022 WL 17420593, at *1 (11th Cir. Dec. 6, 2022); *Smith v. Mercer*, 572 F. App'x 676, 678 (11th Cir. 2014). Therefore, these facts are primarily derived from the Defendants' Statements of Material Facts. [Doc. 50-1]; [Doc. 52-1].

dormitory. [*Id.* at ¶ 6]. At the disciplinary hearing for the incident that same day,

Homan told officers he broke the sprinkler while trying to dry his clothes. [*Id.* at ¶¶ 7–

8]. Following the hearing, officers informed Homan that he would be placed in

disciplinary isolation for 20 days. [*Id.* at ¶ 9].

Before being placed in isolation, Defendant Crystal Wilson-Perez conducted an

"isolation assessment" ensuring there were no "contraindications" precluding Homan

from being placed in isolation. [*Id.* at ¶ 10–12]. During that evaluation, Homan did not

indicate he intended to harm himself. [*Id.*]. On February 11, Homan complained to

Deputy Walter Williams that he experienced a seizure and needed to be taken to the

infirmary. [*Id.* at ¶ 13]. At the infirmary, medical staff concluded that Homan did not

have a seizure, but instead experienced symptoms of withdrawal. [*Id.* at ¶ 14]. In

response, Dr. Charles Clopton prescribed medications to help with his withdrawal

symptoms, but Homan refused to take it. [*Id.* at ¶¶ 15–16].

Later, on February 15, Homan complained of a headache to Deputy Kaleb White

and Defendant Deputy Geoffrey Osman. [*Id.* at ¶ 18]. The officers told Homan he

should put in a sick call. [*Id.* at ¶ 19]. Deputy White then performed a block check

around 11:30 p.m. and saw Homan sitting on his bed in his cell. [*Id.* at ¶ 20]. No one

observed Homan again until Deputy White began handing out food to inmates around

5:30 a.m. [*Id.* at ¶ 21]. After a few minutes, Deputy White realized that Homan failed to

slide his food tray back outside of his door, so Depute White proceeded to look into

Homan's cell. [*Id.* at ¶ 23]. Once Deputy White looked in the window, he realized that Homan had not changed positions from the night before. Deputy White then asked Osman to open Homan's cell, where officers discovered Homan hanged himself with a bed sheet. [*Id.* at ¶¶ 24–25].

Following the incident, Bibb County initiated an internal investigation. *See generally* [Doc. 61-4]. Over the course of that investigation, new facts came to light— including that Deputy White and Osman lied about performing the required hourly block checks and that Defendant Wilson-Perez "did not follow [Defendant CorrectHealth-Bibb's] policy on doing check-ups on inmates while they are in isolation." [Doc. 61-4, p. 19].[3] Also during that investigation, Osman told investigators that he's "been here long enough to know that nobody, no inmate just hangs a towel on a sprinkler head . . . and tries to pull it down . . . so in my opinion that is just an attempted suicide in the beginning." [Doc. 61-4, p. 72].

First, Defendant Geoffrey Osman filed a Motion for Summary Judgment [Doc. 50]. Then, Defendants Crystal Wilson-Perez and CorrectHealth-Bibb, LLC filed a

---

[3] Specifically, Defendant Wilson-Perez told the internal investigators that CorrectHealth policies required her, or another member of the medical staff, to conduct daily assessments of detainees in isolation. However, for the days preceding Homan's suicide, no medical staff member did the required assessment *in person*. [Doc. 61-4, p. 97]. Instead, Defendant Wilson-Perez viewed Homan's inmate record on the computer but did not "put [her] eyes on him," as CorrectHealth's policy requires. [*Id.* at p. 98]. So, again, like Deputy White and Defendant Osman, Wilson-Perez signed off on seeing Homan in the hours preceding his suicide without actually following the required policy or performing the necessary assessments. [*Id.* at p. 104].

Motion to Exclude Causation Testimony [Doc. 51] and also a Motion for Summary

Judgment [Doc. 52].[4] The Court addresses each in turn.

## DAUBERT MOTION

### I.   Legal Standard

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Rulings on the admissibility of expert testimony—like all evidentiary rulings—

necessarily involve the exercise of the Court's discretion. *See Burchfield v. CSX Transp.,*

*Inc.*, 636 F.3d 1330, 1333 (11th Cir. 2011). Trial courts are to act as "gatekeepers" to

ensure that speculative and unreliable opinions do not reach the jury. *Daubert v. Merrell*

*Dow Pharms, Inc.*, 509 U.S. 579, 589, n.7 (1993). "This gatekeeping role, however, is not

intended to supplant the adversary system or the role of the jury: vigorous cross-

examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible

evidence." *United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013). Expert

---

[4] Defendant David Davis also filed a Motion for Summary Judgment [Doc. 61]. In their Response [Doc. 69], Plaintiff agreed Davis was entitled to summary judgment. Accordingly, the Court granted Davis's Motion and terminate him as a defendant. [Doc. 72].

testimony is admissible if "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact . . . to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *City of Tuscaloosa v. Harcros Chems. Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The "'burden of establishing qualification, reliability and helpfulness'" lies with the party offering the expert opinion. *McClain v. Metabolite lnt'l. Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005) (quoting *Frazier*, 387 F.3d at 1260).

In assessing whether an expert's methodology is reliable, the Court generally should consider the following factors: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential error rate of the technique; and (4) whether the technique is generally accepted in the scientific community." *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1327 (11th Cir. 2014) (per curiam). These factors, of course, represent a non-exhaustive list and "'do not constitute a definitive checklist or test.'" *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). "While those factors may help in assessing the reliability of scientific or experience-based expert testimony, the district court's 'gatekeeping inquiry must be tied to the facts of a particular case.'" *Id*. (quoting *Kumho Tire*, 526 U.S. at 150).

In its gatekeeping role, the Court's focus must be on the reliability of the testimony, not simply whether it fits within the narrow confines of lawyer-urged litmus tests. While "'each stage of the expert's testimony [must] be reliable, . . . each stage must [also] be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.'" *Frazier*, 387 F.3d at 1262 (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). The Court's goal is to ensure that an expert "'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id*. at 1260 (quoting *Kumho Tire*, 526 U.S. at 152). "Sometimes the specific [traditional] *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful." *Id*. at 1262. Testimony that the parties plan to present to a jury must be "'properly grounded, well-reasoned, and not speculative.'" *Id*. (quoting Fed. R. Evid. 702 advisory comm. note (2000 amend.)).

Finally, the Court must assess whether the expert testimony helps the trier of fact. This factor turns on whether the expert testimony "concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262–63. "Nor does expert testimony help the trier of fact if it fails to 'fit' with the facts of the case." *Stoner v. Fye*, No. 5:15-cv-102 (CAR), 2017 WL 2434461, at *4 (M.D. Ga. June 5, 2017) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004)). "Expert

testimony lacks 'fit' when 'a large analytical leap must be made between the facts and the opinion.'" *Id.* (quoting *McDowell*, 392 F.3d at 1299); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. "Thus, the court may exclude otherwise reliable testimony if it does not have 'sufficient bearing on the issue at hand to warrant a determination that it [is *helpful* to the trier of fact].' "*Fye*, 2017 WL 2434461, at *4 (quoting *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1234 (10th Cir. 2005)). "At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role as the ultimate fact-finder." *Id.*

## II.   <u>Discussion</u>

Defendants Wilson-Perez and CorrectHealth-Bibb argue that the Court should exclude Dr. Mark McMunn's expert testimony regarding causation. [Doc. 51, p. 2 ("McMunn should be prohibited from offering causation testimony in this case.")]. First, Defendants argue that because Plaintiff must establish both actual and proximate cause as elements of their deliberate indifference claims, and because this case "presents a technical and scientific issue," Plaintiff must present a "qualified expert witness." [Doc. 51, p. 2 (citing *Stanfill v. Talton*, 851 F. Supp. 2d 1346, 1379 (M.D. Ga. 2012))]. Although Plaintiff disclosed Dr. McMunn, Defendants argue that he should be excluded because he "he points to nothing in his education or background that would specifically

qualify him to testify as to the proximate cause of Homan's suicide." [*Id.* at p. 2]. Defendants also argue that because Dr. McMunn is a nurse practitioner, he cannot offer medical causation testimony. [*Id.* at p. 4].

The Court first notes that "acting with deliberate indifference to a serious medical need **is a separate claim** from acting with deliberate indifference to a known risk of suicide." *Jackson v. West*, 787 F.3d 1345, 1358 (11th Cir. 2015) (emphasis added). Here, from Plaintiff's Responses to the various motions, it seems clear that it is pursuing a claim under the latter theory—that Defendants were deliberately indifferent to a known risk of suicide. [Doc. 65, p. 1–2 ("Plaintiffs and Plaintiffs' expert assert that Defendants were deliberately indifferent to Homan's known risk of suicide.")]. Accordingly, Plaintiff argues that "medical causation testimony has not been offered and *nor is it required*." [*Id.* at p. 2 (emphasis added)].

"[I]n a prison suicide case, deliberate indifference requires that the defendant deliberately disregard *a strong likelihood* rather than a mere possibility that the self-infliction of harm will occur." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005). And, to be deliberately indifferent to a "strong likelihood" that the prisoner will commit suicide, "the official must be subjectively aware that the *combination* of the prisoner's suicidal tendencies and the feasibility of suicide in the context of the prisoner's surroundings creates a strong likelihood that the prisoner will commit suicide." *Gish v. Thomas*, 516 F.3d 952, 954 (11th Cir. 2008).

Therefore, Plaintiff need not prove *medical* causation to establish a claim for deliberate indifference to a risk of suicide.[5]

Even with that in mind, though, Plaintiff's proposed expert testimony still faces problems. First, the Eleventh Circuit clearly questioned the reliability of some of the very suicide-risk factors Dr. McMunn discussed in his report. *See Edwards v. Gilbert*, 867 F.2d 1271, 1275–76 (11th Cir. 1989) ("Plaintiff relies only on the affidavit of an expert on jail suicides that lists generalized 'predisposing factors' which the expert contends should have alerted defendants that [the decedent] was at risk."). While examining other circuit decisions, the Eleventh Circuit noted that the law was unclear "on whether the presence of some of the expert's 'factors' which might indicate that a prisoner is in a category of persons more likely to commit suicide than the general population was sufficient to create a duty to take special suicide precautions." *Id.* at 1276. The Eleventh

---

[5] Defendants cite two cases for the proposition that Plaintiff must establish medical causation; however, those cases arose under deliberate indifference to medical needs claims—not deliberate indifference to a risk of suicide. *See Stanfill v. Talton*, 851 F. Supp. 2d 1346, 1375 (M.D. Ga. 2012) ("Specifically, the Plaintiff contends that the Defendants were deliberately indifferent to Stanfill's physical and mental health needs."); *McCrimager v. Swain*, No. 5:18-CV-85-MCR/MJF, 2019 WL 3293294, at *8 (N.D. Fla. Feb. 22, 2019), *report and recommendation adopted*, No. 5:18CV85-TKW-MJF, 2019 WL 3293959 (N.D. Fla. July 22, 2019) ("Defendant moves to dismiss McCrimager's complaint on a second independent ground: failure to state a claim for deliberate indifference to a serious medical need."). Therefore, the elements required in those cases are necessarily different. *See Dudley v. Singleton*, 508 F. Supp. 3d 1118, 1134 (N.D. Ala. 2020) (discussing the different standards between risk-of-suicide cases and medical need claims).

Interestingly, though, Plaintiff uses Dr. McMunn's testimony to assert causation in response to Defendants' summary-judgment motions. See [Doc. 66, p. 9 (Perez's intentional failure to perform a block check on Mr. Homan at any time on the evening of February 15, 2019, into the morning of February 16, 2019—in violation of CorrectHealth's stated Isolation protocol—was a material cause of Mr. Homan's death.")]. Therefore, Plaintiff's own contentions about the proposed use of Dr. McMunn's testimony are inconsistent.

Circuit looked to the Sixth Circuit, which held that a plaintiff's argument that proper screening at a jail would have shown that the decedent fit the profile of high suicide risk in lockup was insufficient to establish deliberate indifference under any definition. *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985). Additionally, the Ninth Circuit affirmed a lower court's holding that officers had no reason to believe the decedent was suicidal despite fact that he was under influence of alcohol or drugs and that he had made a remark, ostensibly in jest, to jailers about killing himself. *Est. of Cartwright v. City of Concord*, 618 F. Supp. 722, 728 (N.D. Cal. 1985), *aff'd*, 856 F.2d 1437 (9th Cir. 1988).

Here, Dr. McMunn offers similar factors, opining that Defendants should have raised Homan's perceived suicide risk assessment based on his prior drug use, isolation, and other factors. [Doc. 51-2, p. 5 ("[Defendant Wilson-Perez] knew that once Mr. Homan was placed on CorrectHealth's Narcotic Withdrawal Protocol and High Risk Benzodiazepine Withdrawal Protocol, there was a significant risk that he would attempt suicide."); p. 7 ("[Defendant CorrectHealth failed to process patient/inmate intake with a Licensed Nurse Practitioner or Registered Nurse[.]")].

Moreover, Dr. McMunn's expert testimony does not offer insight on matters outside the "understanding of the average lay person," which deems his testimony "unnecessary." *Cook*, 402 F.3d at 1111. For that reason, "expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* Additionally, to the extent Dr. McMunn offers

testimony regarding what Defendants "should have known," that testimony "is generally not relevant or helpful to a jury in a deliberate indifference case." *Ross v. Awe*, No. CV419-201, 2022 WL 3927837, at *7 (S.D. Ga. Aug. 31, 2022), *report and recommendation adopted*, No. 4:19-CV-201, 2022 WL 16632973 (S.D. Ga. Nov. 2, 2022).

While Defendants' *Daubert* Motion may have missed the specific bullseye for which it aimed, it still managed to sufficiently strike the overall target. Accordingly, the Court **GRANTS** Defendants' Motion to Exclude Dr. McMunn's Testimony [Doc. 51].[6]

## SUMMARY-JUDGMENT MOTIONS

### I.   Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The moving party bears the initial responsibility of informing the court of the basis for its motion." *Four Parcels*, 941 F.2d at 1437. The movant may cite to particular parts of materials in the record,

---

[6] To be clear, the Court expresses no opinion regarding Defendants' argument that Dr. McMunn should be excluded wholly based on his status as a nurse practitioner. That's a much thornier question and the Court need not wade into that legal thicket today.

including, "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); Fed. R. Civ. P. 56(c)(1)(A).[7] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 323). Rather, "the moving party simply may show—that is, point out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Four Parcels*, 941 F.2d at 1437–38 (quoting *Celotex*, 477 U.S. at 324) (cleaned up). Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.*

If this initial burden is satisfied, the burden then shifts to the nonmoving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable or[] is not significantly probative' of a disputed fact." *Josendis*, 662 F.3d at 1315 (quoting *Anderson*,

---

[7] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

477 U.S. at 249–50). "A mere scintilla of evidence supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's assertion of fact as required by Federal Rule of Civil Procedure 56(c), the Court may consider the fact undisputed for the purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Succinctly put,

> [s]ummary judgment is not a time for fact-finding; that task is reserved for trial. Rather, on summary judgment, the district court must accept as fact all allegations the [nonmoving] party makes, provided they are sufficiently supported by evidence of record. So[,] when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment.

*Sconiers v. Lockhart*, 946 F.3d 1256, 1263 (11th Cir. 2020) (internal citations omitted). Stated differently, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. And "if a reasonable jury could make more than one inference from the facts, and one of those permissible inferences creates a genuine issue of material fact, a court cannot grant summary judgment"; it "must hold a trial to get to the bottom of the matter." *Sconiers*, 946 F.3d at

1263.

## II.   <u>Discussion</u>

While this case is undoubtedly unfortunate, here's the real issue that Plaintiff

must face to carry the day: **"Did any Defendant have any subjective knowledge or**

**indication that Homan exhibited a strong likelihood of taking his own life?"**

To answer that question and establish a viable claim, Plaintiff needs to show that

"the [Defendants] had subjective knowledge of a risk of serious harm and disregarded

that risk by conduct that constituted more than mere negligence." *Gish*, 516 F.3d at 954.

In prison-suicide claims, that means the "[D]efendant[s] deliberately disregard[ed] '**a**

**strong likelihood** rather than a mere possibility that the self-infliction of harm will

occur.'" *Id.* (emphasis added).

Put another way, "[i]n the context of jail suicides, an allegation of deliberate

indifference must be considered in light of the level of knowledge possessed by the

officials involved, or that which should have been known as to an inmate's suicidal

tendencies." *Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990). Absent

knowledge of a detainee's suicidal tendencies, the cases have consistently held that

failure to prevent suicide has never been held to constitute deliberate indifference. *Id.*;

*see also Edwards*, 867 F.2d at 1275 ("In the absence of a previous threat of or an earlier

attempt at suicide, we know of no federal court in the nation or any other court within

this circuit that has concluded that official conduct in failing to prevent a suicide

14

constitutes deliberate indifference.").

### a.   **Defendant CorrectHealth-Bibb**

Although CorrectHealth-Bibb is a private entity, because it "contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state" and "becomes the functional equivalent of the municipality" under section 1983. *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011). Like any other employer, liability against CorrectHealth cannot be based on respondeat superior. Instead, Plaintiff must prove CorrectHealth "had a 'policy or custom' of deliberate indifference that led to the violation of his constitutional right[s]." *Id.* If relying on a custom, a plaintiff must show "a longstanding and widespread practice [that] is deemed authorized by the policymaking officials because they must have known about it but failed to stop it." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991).

In their Response [Doc. 67], Plaintiff concedes that CorrectHealth may not be held liable strictly under respondeat superior. [Doc. 67, p. 3]. Additionally, Plaintiff concedes that they cannot prove CorrectHealth "had an 'official' policy that was unconstitutional." [*Id.* at p. 4]. Instead, Plaintiff relies on a "modified protocol," which "prohibited its nurses from going on to the cell blocks at night." [*Id.* at p. 5]. That protocol is the 'custom' that Plaintiff claims violated Homan's constitutional rights.

However, there is no proof that CorrectHealth's policies ever required—or

should have required—nurses to enter the cell blocks **at night**. Instead, CorrectHealth's policy on segregated inmates required a nurse to contact "each inmate in segregation . . . based on their level of isolation." [Doc. 52-5, p. 8]. Here, because Homan was under limited isolation, medical staff needed to monitor him "3 days per week." [*Id.*].

Even accepting that Wilson-Perez's testimony reflected a policy change prohibiting nurses from entering the cell blocks late *at night*, there is no evidence that CorrectHealth prohibited nurses from entering the cell blocks *at all*. Instead, CorrectHealth required nurses to make contact with isolated inmates 3 days per week. According to Wilson-Perez's interview, the "modified protocol" did not prevent her from checking on Homan in person at all—rather, it just changed the time frame in which she should make those checks. [Doc. 61-4, p. 100]. Wilson-Perez also testified that "[n]o supervisor or director at CorrectHealth ever instructed me not to [go] onto the housing pods at night to check on inmates." [Doc. 52-7, p. 9].

The only evidence that Plaintiff relies on to support the unofficial policy change comes from Wilson-Perez's internal investigation interview with Bibb County officers. There, she implied that a "senior nurse"[8] told her to not go outside of medical late at night. [Doc. 61-4, p. 99]. Then, Wilson-Perez said the next night "the entire thing had changed. We had a different time to go." [*Id.*]. However, that does not show that

---

[8] There is no evidence in the record implying that this "senior nurse" possessed the authority to make any such change. *Harris v. Miami-Dade Cnty.*, No. 1:19-CV-22799, 2022 WL 3226998, at *2 (S.D. Fla. Aug. 10, 2022).

CorrectHealth changed the policy to prohibit nurses from entering the cell blocks at night. But even accepting it as such, that just means that the 3 contacts per week with Homan needed to occur during the day.

Even more, Wilson-Perez testified that pill-pass nurses saw Homan at least twice per day from February 13 through his death on February 15. [Doc. 52-7, p. 7]. Although Wilson-Perez signed off on the contact logs—implying that she contacted Homan in person when she did not—there were still other medical officers making in-person contacts with Homan in the days preceding his suicide.

Finally, Wilson-Perez's failure to follow the prescribed protocols cannot, under these facts, lead to CorrectHealth's liability. *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1294 (11th Cir. 2009) (holding that a city was not liable for a misapplication of training or an officer's failure to follow clear policies). While CorrectHealth likely could have provided clearer directions to its employees, the policies and customs at issue here do not rise to constitutional violations. *See Rivas v. Freeman*, 940 F.2d 1491, 1496 (11th Cir. 1991) ("Unlike the indifference to the providing of policies, procedures, and training on the Sheriff's part, the conduct of the deputies indicate[s] a lack of directions, or at most simple negligence."). Therefore, CorrectHealth is not liable under section 1983.

   **b.**  **Defendant Crystal Wilson-Perez**

Plaintiff argues that Wilson-Perez was deliberately indifferent to Homan's risk of

suicide and failed to check on him pursuant to CorrectHealth's policies.

Wilson-Perez declined having knowledge of Homan previously attempting or threatening suicide. [Doc. 61-4, p. 102]; [Doc. 52-7, p. 8]. Instead, according to Wilson-Perez's affidavit and interview with internal investigators, Homan clearly told her that he did not intend to harm himself. [Doc. 52-7, p. 4]. Wilson-Perez testified that he showed no signs of depression, sadness, or any other indicators that he might intend to harm himself. [*Id.*]. Therefore, it was not Wilson-Perez's duty to assume facts she was not given to construct a likelihood that Homan would later take his own life. *See Williams v. Lee Cnty., Ala.*, 78 F.3d 491, 493 (11th Cir. 1996) ("A reasonable official would have no reason to assume from routine booking information that a prisoner brought with him a strong, or any, likelihood of suicide.").

Plaintiff argues that Defendants, including Wilson-Perez, should have known that Homan was at a "significantly" higher risk of suicide because of his isolation and withdrawals. However, there is neither evidence that Wilson-Perez ever subjectively appreciated that alleged risk, nor evidence showing that Homan's isolation and withdrawals led to a **strong likelihood** of his suicide. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (requiring the defendant to both "be aware of facts from which the inference could be drawn" and "draw the inference" of the risk of harm); *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) ("Strong likelihood" of suicide "must be 'so obvious that a lay person would easily'" recognize the risk).

Even accepting that Wilson-Perez should have known that those factors increased Homan's risk for suicide, it is still not enough to carry Plaintiff's burden.[9] "Implicit in *Popham* is a holding that simple knowledge that the detainee fits the profile of a high suicide risk is not enough." *Bowens v. City of Atmore*, 171 F. Supp. 2d 1244, 1254 (S.D. Ala.), *aff'd sub nom. Bowens v. City of Atmore*, 275 F.3d 57 (11th Cir. 2001) (referencing *Popham*, 908 F.2d at 1564). Additionally, an assertion that a defendant "should have known" of a risk is insufficient to state a deliberate indifference claim. *See Franklin v. Curry*, 738 F.3d 1246, 1249 (11th Cir. 2013) ("The district court erred by finding allegations that they 'knew or should have known' of a substantial risk of serious harm sufficient to state a deliberate indifference claim."). Put another way, "deliberate indifference requires more than constructive knowledge." *Id.* Here, there is no evidence that Wilson-Perez "***actually knew*** of the serious risk" that Homan faced. *Id.*

Lastly, any failure on the part of Wilson-Perez to check on Homan *in person* falls short of establishing deliberate indifference. *Taylor v. Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000) ("Failure to follow procedures does not, by itself, rise to the level of deliberate indifference because doing so is at most a form of negligence."); *Sanders v. Starling*, No. 21-12622, 2022 WL 6644768, at *3 (11th Cir. Oct. 11, 2022) ("In any event, shortcomings in the nurses' documentation or their adherence to protocol amount to a claim that they

---

[9] Wilson-Perez also did not know about the events preceding Homan's assignment to isolation. She assumed he was in isolation "for behavior," but did not know about the incident with the fire sprinkler. [Doc. 61-4, p. 103].

violated prison regulations, not the Eighth Amendment.").

In all, Plaintiff failed to show that Wilson-Perez appreciated any risk that Homan faced a strong likelihood of taking his own life. Accordingly, she cannot face liability under section 1983.

### c.   Defendant Geoffrey Osman

Plaintiff also argues that because Osman expressed that Homan's earlier sprinkler incident was likely an attempted suicide, he had subjective knowledge that Homan would likely attempt suicide again. [Doc. 64, p. 5]. Osman counters those assertions by reaffirming that he did not know about the earlier sprinkler incident until *after* Homan actually committed suicide. [Doc. 50-1, ¶ 30 ("Deputy Osman has made it clear that he was not aware of the February 9, 2019, incident until after Plaintiff's suicide on February 16, 2019.")][10]; [Doc. 50-10, ¶ 7 ("It was not until after Mr. Homan's suicide that I learned about Homan's February 9, 2019, incident involving him breaking a sprinkler.")]. In response, Plaintiff argues that because Osman previously lied about performing the required block checks, his affidavit is "not worthy of belief." [Doc. 64, p. 8]. Plaintiff contends that Osman "has repeatedly made false statements throughout the entire matter concerning Homan's death." [*Id.*].

However, Plaintiff offers no contradictory testimony or evidence to show that

---

[10] As noted *supra* n.1, Plaintiff's failure to respond to Osman's Statement of Undisputed Material Facts deems those facts admitted. Accordingly, Plaintiff admits that Osman did not know about the sprinkler incident until after Homan's death. That is hard to overcome.

Osman knew about the sprinkler incident before Homan's suicide aside from mere speculation that because he lied about doing his block checks, he must be lying about his knowledge of the sprinkler incident. *See McCormick v. Se. Pers. Leasing, Inc.*, No. 22-10466, 2022 WL 4462172, at *1 (11th Cir. Sept. 26, 2022) ("[R]elying on uncontradicted or undisputed evidence in the record is not a credibility evaluation, and therefore it does not circumvent the standards for summary judgment."); *Mahoney v. Owens*, 818 F. App'x 894, 899 (11th Cir. 2020) ("Self-serving though this testimony may be, it was uncontradicted, and the district court was obligated to consider it.").

Surely, it cannot be the case that once a defendant lies about one thing, he can be deemed a liar about all matters concerning the facts of the case. To make such an inference would permit plaintiffs to survive summary judgment purely based on general accusations of falsehood. *Allen v. Chicago Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003) ("It simply is not a reasonable inference from a falsehood in one part of a witness's testimony to the falseness of the entire testimony."); *Bae v. Peters*, 950 F.2d 469, 474 (7th Cir. 1991) ("It is not a foregone conclusion that if a witness lies about one fact he must be lying about every other fact he testifies to.").

Additionally, Osman's interview with the internal investigators and his later clarification in his affidavit are not clearly contradictory. To disregard an affidavit, "our cases require a court to find some inherent inconsistency between an affidavit" and other evidence. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987). That is not

present here. In his interview, he noted that he was *__not__* present for the sprinkler

incident, but in his opinion—after Homan's suicide, and viewing the facts with the

benefit of hindsight—the sprinkler incident was likely an attempted suicide. [Doc. 61-4,

p. 72]. In his later affidavit, Osman clarified that he did not learn of the sprinkler

incident until after Homan's death. [Doc. 50-10, p. 2]. It is entirely consistent that

between Homan's death and the interview with investigators, Osman learned of the

earlier incident and then drew the inference that the sprinkler incident was likely a

suicide attempt.[11]

Taking Osman at his word, then, means that he did not know about any prior

suicide attempts or threats by Homan. That is enough to defeat a claim of deliberate

indifference to a known suicide risk. *Snow ex rel. Snow v. City of Citronelle, Ala.*, 420 F.3d

1262, 1269 (11th Cir. 2005) ("An officer 'cannot be liable under [section] 1983 for the

suicide of a prisoner who never had threatened or attempted suicide and who had

never been considered a suicide risk.'") (quoting *Cook*, 402 F.3d at 1116)); *see also*

*Popham*, 908 F.2d at 1564 ("Absent knowledge of a detainee's suicidal tendencies, the

cases have consistently held that failure to prevent suicide has never been held to

---

[11] Osman correctly notes in his Reply [Doc. 73] that Plaintiff could have easily clarified—or impeached—Osman's knowledge regarding the earlier sprinkler incident through a deposition during discovery. However, Plaintiff failed to do so. [Doc. 73, p. 6 n. 16]; *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) ("The plaintiff may not respond simply with general attacks upon the defendant's credibility[.]").

Even more, Plaintiff could have deposed other officers to inquire into Osman's knowledge of the earlier event, or reviewed footage from the LEC to determine if Osman was in the area of the earlier incident. They did not.

constitute deliberate indifference.").

Assuming, *arguendo*, that Osman is lying and did know about the prior sprinkler incident does not change the outcome, though. First, Osman's speculation about the incident was—at the time—disputed by Homan's clear indication to multiple individuals that the sprinkler broke while he was drying his clothes. [Doc. 50-5, p. 10]; *Novak v. McIlvain*, No. 21-CV-81-JDP, 2022 WL 7464096, at *10 (W.D. Wis. Oct. 13, 2022) ("More generally, [courts have] held that jail staff may rely on an inmate's denial that he is suicidal."); *Jordan v. Summit Cnty., Ohio*, No. 5:17-CV-02047, 2020 WL 1158718, at *13 (N.D. Ohio Mar. 10, 2020) ("Even when a defendant has knowledge of a plaintiff's past attempt to harm himself, such knowledge alone is not enough to demonstrate that a defendant knew that the plaintiff was a suicide risk at a later time.").

Taking all of that to be true, Osman's failure to check on Homan throughout the night on February 15 did not rise to deliberate indifference to a **strong likelihood** of suicide. Instead, Osman's disregard of protocol amounted to negligence at most. *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1147 (11th Cir. 2014) (describing deliberate indifference as an "exacting standard . . . which requires showing more than gross negligence."); *Williams v. Rickman*, 759 F. App'x 849, 852 (11th Cir. 2019) ("The standard is deliberate indifference; negligence does not suffice."); *Taylor*, 221 F.3d at 1259. Lastly, it is permissible for Osman to rely on medical professionals to determine the medical status of inmates—including screening for suicide risk. *See Keith v. DeKalb*

*Cnty., Ga.*, 749 F.3d 1034 (11th Cir. 2014).[12]

There is just no other evidence showing that Osman knew that Homan possessed a strong likelihood of taking his own life. Accordingly, he cannot be liable for Homan's most unfortunate death.

## CONCLUSION

Based upon the foregoing, the Court **GRANTS** Defendants Wilson-Perez and CorrectHealth's Motion to Exclude Expert Testimony [Doc. 51] and Motion for Summary Judgment [Doc. 52]. The Court also **GRANTS** Defendant Geoffrey Osman's Motion for Summary Judgment [Doc. 50]. The Clerk shall **ENTER** Judgment and **CLOSE** this case.

**SO ORDERED**, this 5th day of April, 2023.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[12] That is not to say that jail officers can never be aware of a suicide risk without a medical professional's opinion. Rather, it is permissible for officers to assume that proper protocols were followed when assigning inmates to isolation—including the "contraindication" screening and frequent medical contacts by nursing staff.

Officers, including those higher in rank than Osman, knew about the sprinkler incident. Even if Osman knew about the incident and drew the suicide-attempt inference at that time, those higher-ranking officers did not consider the incident a suicide attempt. If Plaintiff contends Homan should have been placed on suicide watch instead of disciplinary isolation, the claim lies against the officers who made that decision—not Osman. There is no evidence that Osman made the decision to put Homan in disciplinary isolation. Instead, the evidence shows that Lieutenants Anthony Hubbard and Steve Gatlin decided to place Homan in isolation following the sprinkler event. [Doc. 61-4, pp. 89–91].